2026 IL App (2d) 250092-U
No. 2-25-0092
Order filed February 10, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THOMAS BERNING and DANA BERNING, Plaintiffs and Counterdefendants-Appellees,
v. THOMAS J. ROHN, Defendant and Counterplaintiff-Appellant.

Appeal from the Circuit Court of McHenry County.
Honorable Kevin G. Costello, Presiding.
No. 23-MR-84

JUSTICE McLAREN delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Plaintiffs proved the three elements of an implied easement in the section of their garage that encroached on defendant's property: (1) the respective parcels had common ownership before title was severed upon their conveyances to the parties; (2) before title was severed, the common owner used the garage for the benefit of the parcel later conveyed to plaintiffs, and this use was apparent and obvious, continuous, and permanent; and (3) the easement was necessary for plaintiffs to have the full benefit of the garage.

¶ 2    Plaintiffs, Thomas and Dana Berning, and defendant, Thomas J. Rohn, own adjacent properties that they acquired from a common owner in 2021. A garage, built in 1958, straddles the properties. Plaintiffs filed an action to establish an implied easement over a portion of defendant's property so that they could fully use the garage. Defendant counterclaimed for ejectment and

trespass. After a bench trial, the trial court granted plaintiffs the easement and denied the counterclaim. Defendant appeals. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The properties at issue are located between Colby Drive and the Fox River. Colby Drive runs northwest to southeast, west of and roughly parallel to the river. From northwest to southeast, the properties at issue are Lots 50, 51, 52, and 53. As of the bench trial, plaintiffs owned and resided on Lots 50 and 51 and also owned Lot 52. Defendant owned Lot 53. Defendant resided across the street from Lot 53 in a house on the west side of Colby Drive (the Colby Drive house).

¶ 5     Plaintiffs filed an action for an easement by implication. As pertinent here, their amended complaint, filed on November 3, 2023, alleged as follows. In 1958, Fred and Eva Romanus, who owned the Colby Drive house and Lots 52 and 53, built a garage on Lot 52. Approximately 4.7 feet of the garage encroached on Lot 53. Thereafter, Fred and Eva died, and their son Walter purchased the Colby Drive house and Lots 52 and 53. In 2004, Walter and his wife, Dolores, placed Lots 52 and 53 into their living trust. In 2008, Walter died and Dolores became the sole owner of the Colby Drive house and the beneficial owner of Lots 52 and 53. Since the garage was built, the Romanuses had used it—including the portion that encroached on Lot 53—for the benefit of Lot 52, and this use was "apparent and obvious, continuous, and permanent."

¶ 6     The amended complaint continued as follows. On March 5, 2021, Dolores conveyed the Colby Drive house and Lot 53 to defendant, who knew of the encroachment. On April 18, 2021, Dolores conveyed Lot 52 to plaintiffs. Since 2021, defendant regularly complained to plaintiffs about the encroachment and had tried to block their access to the garage. However, "for [plaintiffs] to receive the full benefit of the garage which the common owner constructed, it is necessary that they have full use of the *entire* garage, including that five-foot portion around the garage and the

supporting curtilage located upon [Lot 53]." (Emphasis in original.) The complaint prayed for an easement based on prior use by a common owner.

¶ 7    Defendant filed an answer and a counterclaim for trespass. The trial court held a bench trial.

¶ 8    Terry Van Alstine, a licensed surveyor, testified as follows. Plaintiffs' exhibit No. 1 was a plat of survey, dated March 13, 2021, that his firm prepared for plaintiffs. See *infra* ¶ 62, Appendix A. It depicted Lots 50 through 53, including all improvements. Specifically, "Lot 52 ha[d] an asphalt driveway with a garage and a couple pieces of concrete." The corners of the garage were oriented north, south, east, and west. The garage was 20.3 feet on the northwest and southeast sides and 24.2 feet on the northeast and southwest sides. The asphalt driveway connected the southwest side of the garage with Colby Drive. Concrete aprons abutted the garage on the northeast and southwest sides. The southeast portion of the garage and the concrete apron abutting the northeast side extended 4.7 feet across the lot line onto Lot 53. Thus, the area of encroachment was 4.7 feet by 20.3 feet. These figures did not take into account the distance by which the roof overhung the garage.

¶ 9    Van Alstine identified Plaintiffs' exhibit No. 2 as a plat, also dated March 13, 2021, that he prepared for plaintiffs. See *infra* ¶ 63, Appendix B. It was an enlarged depiction of the garage, with the same dimensions indicated in Plaintiffs' exhibit No. 1. The plat showed the location of the garage, including the length and width of the encroachment on Lot 53. The plat indicated that the asphalt driveway on the southwest side of the garage wrapped around to the southeast side of the garage. The trial court admitted both exhibits into evidence.

¶ 10   Thomas Berning testified as follows. In 2004, plaintiffs acquired Lots 50 and 51, where they still resided (they owned a farm down the road). In April 2021, after Dolores had moved out

of the Colby Drive house and was living with her daughter, Kathy McAfee, plaintiffs purchased Lot 52. Defendant had previously purchased Lot 53 and the Colby Drive house.

¶ 11 Berning identified Plaintiffs' exhibit No. 4 as a photograph a neighbor took from Lot 51 shortly after plaintiffs acquired Lot 52. The photograph depicted the northwest and southwest sides of the garage. The southwest side had an overhead door and a service door. In front of the doors was a hayrack that, according to Berning, plaintiffs used for items Dolores left in the garage. Also depicted was a large dumpster, its contents on fire. According to Berning, plaintiffs did not own the dumpster.

¶ 12 Berning then identified five photographs taken about 30 days before trial. Berning identified Plaintiffs' exhibit No. 5 as a photograph of the southwest and southeast sides of the garage, the latter being the portion that encroached on Lot 53. The photograph showed that the asphalt drive connecting the garage with Colby Drive wrapped around to the southeast side of the garage. Along the southeast side were various items, which Berning identified as "defendant's garbage cans and burn barrel and fire pit along with some other stuff." Also visible was the service door on the southwest side of the garage. Several feet in front of the service door were defendant's garbage bins. Next, Berning identified Plaintiffs' exhibit No. 6 as showing both the overhead door and the service door on the southwest side of the garage. According to Berning, the overhead door in Plaintiffs' exhibit No. 6 had been installed in place of the "failing" overhead door seen in Plaintiffs' exhibit No. 4. Next, Berning identified Plaintiffs' exhibit No. 7 as showing the southeast side of the garage. Visible along that side were various items, which Berning identified as "defendant's burn barrel, fire ring or fire pit, *** something that holds lumber or firewood, and *** another small garbage can."

- 4 -

¶ 13    Berning identified Plaintiffs' exhibit No. 8 as depicting the northeast side of the garage, which faced the river.  In the foreground was plaintiffs' utility vehicle, which they used on their farm.  The photograph also showed an overhead door (the second one on the garage—the other being on the opposite, or southwest, side) at the southeast end (left side in the photograph) of the northeast side.  Vegetation had grown in front of the left side of the overhead door and continued in a northeastern line toward the river.  According to Berning, the vegetation was "bushes and shrubs that were planted in 2022 to *** restrict access."  Visible beyond the bushes, around the corner from the overhead door, was defendant's burn barrel situated on the southeast side of the garage.  Berning was unable to replace the northeast overhead door because he had "restricted access to that side of the garage."  Berning acknowledged that 4.7 feet of the garage visible on the left (southeast) side of the photograph encroached on Lot 53 and that Berning would be unable to replace the overhead door without going on defendant's property.  According to Berning, the bushes in the photograph were not there when plaintiffs purchased Lot 52 in April 2021; he estimated that they were planted in the summer of 2022, or possibly 2023.  Berning testified that the bushes ran northeast from the east corner of the garage, along the property line with Lot 53.  The bushes in front of the northeast overhead door left insufficient space for plaintiffs to drive their utility vehicle into the garage.

¶ 14    Berning identified Plaintiffs' exhibit No. 9 as a "closer up version of [Plaintiffs' exhibit No. 8]"[1] that showed the concrete apron in front of the northeast overhead door.  The trial court admitted Plaintiffs' exhibits Nos. 5 through 9 into evidence.

_____

[1]Although the trial court admitted Plaintiffs' exhibit No. 9 into evidence, it does not appear in the record.  It is also not listed in the exhibit list included in the appendix to plaintiff's brief.

¶ 15　Berning testified that, when he purchased Lot 52 in 2021, the garage's concrete floor was in good condition. Plaintiffs' improvements to the garage included painting, caulking, and replacing the southwest overhead door, which was "outdated and not functioning well." "Not much" work was required to put the garage in its present condition. There was no need to replace any wood.

¶ 16　Berning testified that, because he could not access the 4.7-by-20-foot portion of the garage that encroached on Lot 53, he could not access the northeast overhead door and could not "get to the other side for maintenance." Berning was asked how, apart from the bushes, defendant had "restricted [Berning's] access to the [northeast] [overhead] garage door." He replied:

"A. There was a time where the burn barrel that we've seen in many pictures was over there up against the door with debris in it like it was ready to be lit. There has been just rubbish and debris. I don't even know what it was, lumber or bags stacked up over there. There has been lawn equipment like umbrellas, tables and chairs over there.

Q. And when [you] say over there, do you mean—

A. On that concrete apron facing [northeast] in front of the [northeast overhead door].

Q. So those items have been on the apron?

A. Yeah. They move in and out. They are different every week. It's a continual process of where things get put there, removed, put there, removed."

Asked how often he was denied access to the northeast overhead door, Berning testified, "Daily."

¶ 17　Berning testified on cross-examination as follows. Between when he acquired Lots 50 and 51 and when Walter Romanus died, Walter, a tool and die maker, used the garage "for many

things," including storing some of his tools. After Walter died, everything in the garage, including bicycles,[2] belonged to Dolores, but Berning never saw her enter the garage.

¶ 18    Berning testified that Plaintiffs' exhibit Nos. 8 and 9 showed what defendant's counsel called a "kind of tree thing, weedy thing" on the left (southeast) side of the northeast overhead door. Asked whether removing this vegetation would enable him to maneuver his utility vehicle into the garage, Berning testified, "I can drive right over that." But he added, "I don't think it would fit. I don't think it would." He admitted that he had not tried, but he explained, "I haven't tried because I know it doesn't fit." Asked if the northeast overhead door "even work[ed]," he answered, "It could be operational very easily, yes. The tracks are on, the rollers are on. Everything is there." Asked if he had tried to open the door, he said that he "ha[d] not had a reason to open it." The bushes depicted in Plaintiffs' exhibit No. 8 were on defendant's property when he planted them, but they have since "start[ed] to encroach onto the other side." Berning admitted that it was "[n]ot really a big deal anywhere else other than up by the building."

¶ 19    On redirect examination, Berning testified that the bushes prevented him from getting his utility vehicle into the garage. Asked why he had not attempted to operate the northeast overhead door, Berning answered, "I'm in fear that the defendant will come around the corner and cause problems, and I'm just trying to stay away from stuff like that."

¶ 20    McAfee testified as follows. Until she was 19, she resided in the Colby Drive house with her parents, Walter and Dolores, and her siblings. During that time, the garage across the street was used "for multiple things." She continued:

---

[2]Berning implied that no cars were stored in the garage.

"It was used—my parents had showed [*sic*] Collies and raised them. There were Collies in there at one time. My dad's machine shop, my mom's gardening. She gardened a lot, but that was near the end. \*\*\* [A]fter my father passed away, she did a lot of things with gardening, \*\*\* and way back when I was a teenager, \*\*\* we actually had a couple [of] cows in there at one time."

¶ 21 McAfee testified that, initially, the garage stored cars, and there were "multiple different purposes after that." While she resided in the Colby Drive house, both the northeast and southwest overhead doors were used, first to store "lawn tractors and mowers and stuff" and later the dog kennels. Her family used the northeast overhead door for lawn tractors and other items used to take care of the "outside yard." At that time, the bushes shown in Plaintiffs' exhibit No. 8 were not there.

¶ 22 McAfee testified that, when the lots were put up for sale in 2021, the garage "hadn't changed in years" and appeared "pretty much the same" as when she was in her teens. As far as she knew, the garage was not "dilapidated." The properties were put up for sale because Dolores was going into assisted living. McAfee helped with the sales. In 2021, defendant bought the Colby Drive house and Lot 53, and plaintiffs bought Lot 52. As of then, the garage "hadn't changed in years." The bushes shown in Plaintiffs' exhibit No. 8 were not there at the time of the sale. During the sale negotiations, the garage's encroachment was not mentioned. At the closing, no "issue [was] made" of the encroachment.

¶ 23 On cross-examination, McAfee testified that, after she moved out of the Colby Drive house at age 19, her parents continued to use the garage for "multiple things \*\*\* machine shop, gardening, et cetera." After Walter died, McAfee did not see Dolores use the garage, but Dolores

- 8 -

"had her gardening stuff in there." Dolores "never did" quit gardening. McAfee never saw any improvements made to the garage.

¶ 24    McAfee testified that Dolores resided with her for less than a year before selling the Colby Drive house and going into assisted living. During this interim, she and McAfee still frequented the house to feed the cats and collect the mail. During negotiations over the sales of Lots 52 and 53, "[t]he realtors both noted [the encroachment] and that was the end of the conversation." "It was never a dispute. The dispute didn't seem to rise up until several months later." McAfee and Dolores never discussed the matter with either plaintiffs or defendant. McAfee was shown Defendant's exhibit No. 5, an affidavit that Dolores submitted in support of an application for title insurance. McAfee agreed that paragraph 6 stated, "[T]here are no unrecorded leases, easements or other servitude's [*sic*] to which the land or building, or portion thereof, are subject." The trial court admitted the affidavit into evidence.

¶ 25    In her remaining testimony, McAfee stated that, after Dolores moved in with her, they still went to the Colby Drive house "on and off *** every weekend, took care of the animals during the week and stuff." They also did gardening, such as trimming flowers near the house.

¶ 26    Called as an adverse witness, defendant testified as follows. Before making an offer to Dolores, he examined Lot 53 once or twice. By a letter dated December 23, 2020, he offered to purchase the Colby Drive house and Lot 53. On the morning of the closing, he examined Lot 53 again. Shown a copy of Plaintiffs' exhibit Nos. 12 and 13, the title insurance policy for the property and the loan policy of title insurance, both of which he received at the closing, defendant acknowledged that they excluded from coverage the encroachment of the garage on Lot 53, as disclosed by a 1992 plat of survey. The exhibits were admitted into evidence.

¶ 27   Defendant acknowledged that Plaintiffs' exhibit No. 7 showed several of his items next to the southeast side of the garage.  He also acknowledged that he planted the bushes shown in Plaintiffs' exhibit No. 9.[3]  He recognized that the bushes, which were planted along the boundary line with Lot 53, were now growing in front of the northeast overhead door.  Defendant admitted that he sometimes stored "debris and umbrellas" by the northeast overhead door.

¶ 28   Defendant acknowledged that, despite his awareness of the garage's encroachment, he did not raise the issue during the sale negotiations.  His attorney did write a letter to Dolores (Defendant's exhibit No. 8), noting concern about the encroachment, but she never responded.  The encroachment was not discussed at the closing.

¶ 29   On examination by his counsel, defendant testified as follows.  The sales contract that he signed stated that the title " 'will be good and merchantable subject only to covenants, conditions and restrictions of record and building lines and easements, if any; provided they do not interfere with the current use and enjoyment of the real estate.' "  When defendant acquired Lot 53, it was his understanding that no easement encumbered it.  He never intended to create an easement on Lot 53.

¶ 30   On examination by the trial court, defendant testified that, when he purchased the Colby Drive house and Lot 53, Dolores still owned Lot 52.  At that time, defendant did not know whether Dolores planned to sell Lot 52.

¶ 31   Plaintiffs rested.

---

[3]Again, Plaintiffs' exhibit No. 9 is not in the record.  The bushes, however, are fully visible in Plaintiffs' exhibit No. 8, which is another view of the northeast side of the garage.

¶ 32    Defendant testified as follows.  He wanted to have full use of his property, including "the full apron that [he] purchased and *** pa[id] property taxes for."[4]  He wanted to "build perhaps [his] own pop-up shed and do more landscaping where [he] [had] already planted [his] bushes and perhaps put up a gate so that [he] [had] security and privacy on [his] Lot 53."

¶ 33    On cross-examination, defendant reaffirmed that the encroachment prevented him from putting a pop-up shed "[o]n the road front" where the garage was.  Asked what would prevent him from putting the shed "50 feet into the lot" "out of the way of the snow plow [*sic*]," defendant made no audible response.

¶ 34    On redirect examination, defendant testified that he parked on the asphalt apron that was on the garage's southeast side.  Plaintiffs' maintenance providers parked there when they worked on the garage, preventing him from parking there.

¶ 35    Defendant rested.

¶ 36    After hearing arguments, the trial court issued a written opinion stating as follows. Plaintiffs sought an implied easement based on a preexisting use.  A claim for this type of easement requires proof by clear and convincing evidence of three elements: (1) common ownership of the claimed dominant and servient parcels and a subsequent conveyance or transfer separating that ownership; (2) before severance of the title, the common owner's apparent and obvious, continuous, and permanent use of part of the united parcel for the benefit of another part; and (3) the claimed easement is necessary and beneficial to the enjoyment of the parcel conveyed or retained by the grantor or transferor.  See *Dudley v. Neteler*, 392 Ill. App. 3d 140, 145 (2009).

---

[4]Presumably, defendant meant the asphalt apron that connected the southwest side of the garage with Colby Drive and wrapped around the (encroaching) southeast side of the garage.

¶ 37    After noting that the first element was not in dispute, the trial court held that plaintiffs had proved the remaining two elements. Citing *Dudley* and *Swieton v. Landoch*, 106 Ill. App. 3d 292 (1982), both of which we shall address in detail in our analysis, the court reasoned as follows. As to the second element, the common owner placed the garage mostly on Lot 52 but also partly on Lot 53. All parties, including defendant, knew the location of the garage before he acquired Lot 53. Further, as the garage was located on both lots, "the only reasonable conclusion [was] that its use by the Romanus family prior to the sale of lots [*sic*] 52 was for the benefit of both lots."

¶ 38    The trial court rejected defendants' argument that Dolores's use of the garage after Walter died in 2008 was not apparent and obvious, continuous, and permanent. Although defendant cited the conflicting evidence about whether Dolores gardened in her later years or even entered the garage, this evidence was "immaterial":

"A principal use of a garage is to store things. It is undisputed that items were stored in the garage continuously since it was built in 1958 up to the time [defendant] bought lot 53. The storage of those items was apparent and obvious, and like the garage itself, permanent. The continued presence of the garage itself would likely meet the threshold; the continued use of it by storage of items makes this point inarguable. The analysis would be no different if the garage simply stored a vehicle the entire time that was never touched."

¶ 39    Turning to the third element, the trial court explained that plaintiffs had proved that they needed the claimed easement to receive the full benefit of the entire garage. Without "access to the entire garage," they could not fully use or maintain it. Berning gave "unrebutted testimony that he need[ed] to be able to access the garage and remove items from it via the [north]east access

door." The court concluded that plaintiffs were "entitled to access the entire garage, including the curtilage[,] in order to receive the benefits of the garage."

¶ 40    The trial court also rejected defendant's argument that, regardless of having proved the three elements of their claim, plaintiffs should be denied an implied easement because, in transferring Lot 53 to defendant, Dolores warranted that she was selling the land free of easements. The court reasoned that whether Dolores retained any express easements was irrelevant: the issue was whether the prior use of the garage and the other pertinent circumstances created an implied easement. The court also noted that, prior to the sale of Lot 53 to defendant, neither Dolores nor defendant expressed any concerns about the encroachment, of which they both knew.

¶ 41    The trial court granted plaintiffs the implied easement and denied defendant's counterclaim. Defendant timely appealed.

¶ 42                                                    II. ANALYSIS

¶ 43    On appeal, defendant argues that plaintiffs failed to prove that they are entitled to the claimed easement, because (1) plaintiffs failed to prove either of the disputed elements of their claim and (2) at the time that title to the parcels was severed, the parties did not intend to establish an easement by implication. For the following reasons, we disagree with defendant.

¶ 44    The party claiming an easement by implication from a prior existing use must establish the elements of that claim by clear and convincing evidence. *Gacki v. Bartels*, 369 Ill. App. 3d 284, 290 (2006). However, on appeal, we may not disturb the trial court's judgment only if it was against the manifest weight of the evidence. *Evanik v. Janus*, 120 Ill. App. 3d 475, 489 (1983).

"[A]n easement implied from a preexisting use is established by proof of three elements: first, common ownership of the claimed dominant and servient parcels and a subsequent conveyance or transfer separating that ownership; second, before the conveyance or

- 13 -

transfer severing the unity of title, the common owner used part of the united parcel for the benefit of another part, and this use was apparent and obvious, continuous, and permanent; and third, the claimed easement is necessary and beneficial to the enjoyment of the parcel conveyed or retained by the grantor or transferrer." *Granite Properties Limited Partnership v. Manns*, 117 Ill. 2d 425, 437 (1987).

¶ 45    Absent an express agreement to the contrary, the grant of property carries "all the benefits and burdens which existed at the time of the conveyance *** even though such grant is not reserved in the deed." *Id.* at 436.

¶ 46    We turn to the authority that the trial court cited in its opinion. In *Dudley*, in 1996, the defendant's great aunt, Irene Neteler, first conveyed one parcel to him and his wife, then conveyed an adjacent parcel to the plaintiff's predecessor in interest. *Dudley*, 392 Ill. App. 3d at 142. A house straddled the parcels. *Id.* The deed to the plaintiff's predecessor in interest reserved to Irene a life estate in the entire house, but the deed to the defendant did not. *Id.* at 141-42. Thereafter, the house was taxed as part of the plaintiff's tract, but the defendant's tract was taxed as vacant land. *Id.* at 142. Irene resided in the house until her death in May 2006 (possibly earlier). *Id.*

¶ 47    In November 2006, the plaintiff filed an action to quiet title, claiming possession and ownership of the house, free and clear of any claim from the defendant. *Id.* In February 2007, the defendant counterclaimed to quiet title. *Id.* The trial court granted summary judgment to the plaintiff, holding that she had title to the real estate on which the house was located and also to the " 'surrounding curtilage of the [house] in the same manner as had been maintained by [Irene] during her lifetime' " *Id.* at 143.

¶ 48    On the defendant's appeal, the appellate court held that, although the trial court erred in awarding the plaintiff a judgment quieting title, she was entitled to a declaratory judgment that she

had an implied easement over the portion of the home and curtilage on the defendant's parcel. *Id.* at 144. All three elements were proved. First, Irene owned both parcels until 1996, when she made both conveyances. *Id.* 146. Second, before the severance, she used the servient tenement (later conveyed to the defendant), on which half of the house sat, to benefit the dominant tenement (later conveyed to the plaintiff), on which the driveway, the garage, and the other half of the house sat, and her use of the property was apparent and obvious, continuous, and permanent. *Id.* Third, "the claimed easement [was] necessary to [the] plaintiff's enjoyment of the parcel conveyed." *Id.* Specifically, "[i]n order for [the] plaintiff to receive the full benefit of the residence which Irene conveyed to her, it [was] necessary that she have full use of the entire residence, including that portion and the supporting curtilage located upon [the] defendant's property." *Id.*

¶ 49    In *Swieton*, the trial court awarded the defendants, who owned the southern portion of a tract of residential land (Lot 11), an easement by implication against the owners of the northern portion. *Swieton*, 106 Ill. App. 3d at 293, 295. In 1953, the common owners erected two houses on Lot 11. *Id.* at 297. They then divided Lot 11, selling the north parcel in 1954 and the south parcel in 1955. *Id.* at 296-97. In 1971, the plaintiffs acquired the north parcel, and, in 1976, the defendants acquired the south parcel. *Id.* at 295. When the defendants purchased the south parcel, a picket fence ran from the eastern edge of Lot 11 but stopped short of either house. *Id.* On the north side of the defendants' house was a side entrance several feet above ground level and a concrete stoop with steps on the east that led to the front walk and steps on the west that led to the rear service walk. *Id.* A concrete walk (sidewalk) leading west from the stoop's steps contained a sewer catch basin for the defendant's house. *Id.*

¶ 50    In 1976, the defendants replaced the picket fence with a chain-link fence that spanned the entire area between the houses. *Id.* The defendants assumed that the chain-link fence was located

wholly on their property. *Id.* However, a new survey showed that the entire fence and several inches of the stoop, stairs, and sidewalk were actually on the plaintiffs' property. *Id.* at 296. After a bench trial, the defendants were awarded easements by implication for the stoop and steps, the sidewalk, and the catch basin. *Id.* at 297.

¶ 51 The appellate court affirmed the judgment granting an implied easement in the catch basin but reversed the judgment granting the other implied easements. *Id.* at 300. The court reached that conclusion based on the third element of the test for an implied easement. *Id.* at 299-300. As to that element, the court noted that the law did not require "a showing of absolute necessity" but only that "such easements be reasonable, highly convenient and beneficial to the dominant estate." *Id.* at 300. Nonetheless, the defendants established the third element, benefit to the dominant estate, as to the catch basin only. *Id.* The catch basin's benefit was "self-evident" because it provided access to the sewer system. *Id.* However, there was little evidence that the mere inches-wide encroachment by the stoops, steps, and sidewalk provided significant benefit to the defendants' property. *Id.*

¶ 52 While these opinions provide guidance, we recognize that ultimately the existence of an easement is highly fact-specific. We apply the pertinent principles to the facts here.

¶ 53 It is undisputed that plaintiffs met the first element. On the second element, defendant argues that plaintiffs did not prove that, after Walter's death in 2008, the use of the garage was apparent and obvious, continuous, and permanent until the severance of title in 2021. Defendant focuses on the limited evidence that Dolores entered the garage or otherwise engaged in any activities there after 2008. We agree with the trial court, however, that the primary use of a garage is for storage and that there was evidence from which the court could infer that, even after 2008, Dolores did use the garage for this purpose. At a minimum, the court could conclude that her

gardening tools were stored there until very shortly before the sales, as McAfee testified that, even after Dolores moved in with McAfee, they returned regularly to the Colby Drive house and did gardening work. Although defendant suggests that the garage was abandoned after 2008, both Berning and McAfee testified to the good condition in which the structure had been kept. Moreover, Berning testified that, after plaintiffs acquired Lot 52, he removed from the garage items that Dolores had stored there. And, as the trial court also noted, the garage itself was open, obvious, and in continuous existence since 1958. Although Dolores's use of the garage might not have been as extensive as Irene's use of the house in *Dudley*, it was sufficiently established. Therefore, the trial court's resolution of the second element is not against the manifest weight of the evidence.

¶ 54    On the third element, whether the trial court erred in finding necessity, *i.e.*, that the easement is "reasonable, highly convenient and beneficial to [Lot 52]" (see *Swieton*, 106 Ill. App. 3d at 300), defendant limits his argument to the bare conclusion that, like the claimants in *Swieton*, plaintiffs introduced only "meager" testimony that their "post-purchase use of their property is in any way enhanced by the easement."

¶ 55    The record belies defendant's assertion. Berning testified that, without the easement, he could not replace the northeast overhead garage door or "get to the other side for maintenance." Further, because of the bushes extending in front of the northeast overhead door, Berning did not have enough space to pull his utility vehicle in through the door. Finally, the presence of the burn barrel, other heavy objects, and debris regularly prevented him from entering the garage at all from the northeast side. This case is unlike *Swieton*, where the defendants failed to prove that the mere inches-wide encroachment by their walkways was necessary for the use and enjoyment of their property. *Id.* Plaintiffs require access to the whole exterior of the garage in order to properly

maintain the structure. Thus, without the easement, plaintiffs would lack the full benefit of the garage.

¶ 56 The trial court properly relied on Berning's "unrebutted" testimony that, without the easement, he was unable to access the entire garage and thus could not fully use or maintain the garage. The court properly concluded that the easement was reasonably beneficial to the dominant estate, Lot 52. Thus, we hold that plaintiffs proved all three elements of the easement that they sought.

¶ 57 Defendant, nonetheless, argues that plaintiffs failed to prove a fourth and independent "element": that, when the title was severed, the parties (Dolores and defendant) intended to create an easement by implication. Defendant cites, but misunderstands, our statement in *Emanuel v. Hernandez*, 313 Ill. App. 3d 192, 196 (2000), that "an implied easement is the product of the intention of the parties to the conveyance." Defendant overlooks that this "intention" is to be inferred from consideration of the second and third elements of the *Manns* test, not from some independent source. See *Manns*, 117 Ill. 2d at 436-37; *People ex rel. Helgeson v. Hackler*, 21 Ill. 2d 267, 270-71 (1961); *Canali v. Satre*, 293 Ill. App. 3d 407, 410 (1997). Defendant cites no authority that the intent of the parties is a fourth element of a claim for an easement, and the law is otherwise.

¶ 58 Defendant notes that, in her affidavit in support of an application for title insurance, Dolores certified that there were no unrecorded easements. However, despite Dolores's affidavit, the title insurer recognized, and expressly excluded from coverage, the garage's encroachment. Moreover, while Illinois recognizes that an easement may be terminated by a "release from the dominant owner to the servient owner" (*Beloit Foundry Co. v. Ryan*, 28 Ill. 2d 379, 390 (1963)), Dolores's affidavit cannot be construed as such.

¶ 59                    III. CONCLUSION

¶ 60    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 61    Affirmed.

¶ 62   Appendix A



- 20 -

¶ 63    Appendix B

